**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CORNELL COFFIE, a minor, by his mother** | ) | |
| **and next friend, Patrice Boothe,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05 C 4702** |
| **v.** | ) | |
| | ) | **Mag. Judge Michael T. Mason** |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Cornell Coffie, ("Coffie" or "claimant"), a minor, by his mother and next friend,

Patrice Booth, filed a motion for summary judgment seeking judicial review of the final

decision of the Commissioner of Social Security ("Commissioner").  The Commissioner

denied claimant's application for child's Supplemental Security Income benefits under

the Social Security Act ("Act"), 42 U.S.C. §§ 1382c(a)(3).  Claimant also filed a motion

for remand pursuant to sentence six of 42 U.S.C. § 405(g).  The Commissioner filed a

cross-motion for summary judgment asking that this Court uphold the decision of the

Administrative Law Judge ("ALJ").  We have jurisdiction to hear this matter pursuant to

42 U.S.C. § 405(g).  For reasons set forth below, claimant's motion for summary

judgment is granted, claimant's motion for remand pursuant to sentence six of 42

U.S.C. § 405(g) is denied and the Commissioner's motion for summary judgment is

denied.  This case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

**Procedural History**

On June 2, 2002, claimant's mother, Patrice Boothe ("Ms. Boothe"), filed an application for Supplemental Security Income ("SSI") benefits on his behalf. (R. 15). Ms. Boothe alleged that claimant became disabled because of his severe asthma. (R. 28). The application and subsequent request for reconsideration were both denied. (R. 25-33). Claimant's mother then requested and was granted a hearing on November 2, 2004 before ALJ Alfred Burton. (R. 34, 38). Ms. Boothe, and a medical expert ("ME"), Dr. Milford Schwartz, testified at the hearing. On March 14, 2005, ALJ Burton issued a written opinion denying claimant's request for benefits. (R. 15-22). The Appeals Council denied his request for review and ALJ Burton's decision became the final decision of the Commissioner. *See Zurawski v. Halter,* 245 F.3d 881, 883 (7th Cir. 2001). Ms. Boothe subsequently filed this action in the district court on behalf of the claimant.

**Claimant's Mother's Testimony**

Ms. Boothe testified that she was claimant's natural mother and that claimant was three years and two months old at the time of the hearing. (R. 323-324). Claimant did not testify at the hearing. Ms. Boothe testified that claimant has had health problems since birth, including a stomach hernia, ear infections, and asthma. (R. 324). She testified that claimant has daily asthma attacks. (R. 329-30). Ms. Boothe further stated that claimant's asthma was getting worse. (R. 324).

Additionally, claimant was still having trouble sleeping due to heavy breathing

and wheezing. (R. 327). Ms. Boothe testified that Dr. Dana had discussed the possibility of surgery for claimant's obstructive sleep apnea but no surgery had been scheduled as of the date of the hearing. (R. 328). Ms. Boothe further testified that she was taking claimant to see Dr. Dana following the hearing that day because he had been complaining of earaches. (*Id.*).

At the time of the hearing, claimant was attending pre-school three to four days a week from approximately 10:00 A.M. to 5:30 P.M. (R. 328-329). Claimant had been at the pre-school for approximately one year and the pre-school staff had not changed during that time. (R. 329). Claimant had not had his hearing tested as of the date of the hearing. (R. 326). Claimant's pre-school did not conduct basic hearing, vision screening or speech assessments. (R. 327).

Ms. Boothe testified that claimant had required emergency room treatment for his asthma during the prior year, but did not have to stay overnight at the hospital. (*Id.*). Claimant had not been hospitalized for anything other than asthma during that time period. (R. 330). Ms. Boothe explained that claimant was no longer taking Flonase due to his hyperactive response to it. (R. 328). She testified that at the time of the hearing, claimant was taking Cromolyn, Exponex, and Pulmocort for his asthma. (R. 330). Ms. Boothe stated that one of the medications was making claimant hyper. (*Id.*). Ms. Boothe testified that claimant was otherwise calm when he was not on medication. (*Id.*). When the ME asked Ms. Boothe why claimant would ever be off the medication if he has chronic asthma, Ms. Boothe testified that she was giving claimant Exponex for daily asthma attacks, but had ceased giving him the other two medications on October 28, 2004 in accordance with Dr. Dana's orders. (R. 330-331).

3

Ms. Boothe testified that Dr. Dana had not referred her to a children's lung specialist or an allergist for claimant's problems. (R. 332). Ms. Boothe added that she was taking claimant to see Dr. Dana later that day to determine what the next step in his treatment should be. (*Id.*).

**Medical Evidence**

Claimant was born on August 20, 2001. (R. 57). Dr. Jalai Rais Dana, claimant's pediatrician, saw claimant on nine occasions between August 23, 2001 and May 11, 2002. (R. 107, 109). Dr. Dana's records state that claimant had four episodes of infection during that time, such as otitis media (an acute or chronic inflammation of the middle ear) and bronchitis. (R. 109). The records indicate that claimant made several visits for colic, otitis media, vaccinations and gastroesophageal reflux. (R. 107-109).

On December 10, 2001, claimant was treated at Holy Family Medical Center for complaints of vomiting. (R. 204-208). The vomiting had stopped and claimant was discharged. (*Id.*). On December 29, 2001, claimant visited the emergency room at Cook County Hospital. (R. 133-136). Claimant was treated for fever, cough and runny nose. (*Id.*). The emergency room record shows that claimant has a history of otitis media. (R. 133, 136).

On April 3, 2002, claimant was treated at the emergency room at Cook County Hospital for complaints of asthma/wheezing, congestion, and cough. (R. 104-106, 126-132, 137). Claimant was diagnosed with a viral infection and discharged. (R. 106, 137).

In June 2002, Dr. Dana completed a Respiratory Report for Children. (R. 107-108). He reported that claimant's respiration was normal, and there was "no asthma so

far." (*Id*.). At that time, Dr. Dana diagnosed "resolved gastroesphegeal reflux." (R. 107).

On June 11, 2002, a director from claimant's daycare/pre-school, Kindercare Learning Center ("Kindercare"), completed a School Activities Questionnaire. (R. 96-99). The director stated the she saw claimant approximately eight hours a day four to five days per week. (R. 96). The director indicated that claimant missed school quite often because of illness. (R. 99). The director further stated that claimant had a lot of ear infections as well as colds and congestion. (*Id*.). The director noted that claimant often needed medicine, including nasal spray, oragel, nasal bulb, and antibiotics. (R. 98-99).

On June 19, 2002, Dr. Edward Ference, a state agency consultant, completed a Childhood Disability Evaluation Form. (R. 110-11). Dr. Ference reviewed medical records from Dr. Dana and Cook County Hospital, as well as the Kindercare questionnaire. (R. 110). Dr. Ference found that claimant had no medically determinable impairment or combination of impairments that resulted in more than minimal functional limitations. He indicated that claimant had a history of gasteroesophageal reflux that had resolved. (*Id*.). Dr. Ference noted that emergency room records included a box marked "asthma." However, he found no sign of asthma yet. (*Id*.).

On November 5, 2002, Dr. Lee Hurshman, another state agency consultant, completed a Childhood Disability Evaluation Form. (R.118-119). Dr. Hurshman indicated that claimant alleged asthma, but there was no evidence of ongoing treatment for it. (R. 118). Dr. Hurshman noted that claimant had been treated for a viral infection

5

and that claimant had suffered from colds and ear infections, but his hearing and breathing were normal.  (*Id.*).  Dr. Hurshman also noted that claimant was diagnosed with gastroesophageal reflux, which had been resolved.  (*Id.*).  Dr. Hurshman concluded that claimant's gastroesophageal reflux impairment was not severe.  (*Id.*).

Medical records from the City of Chicago Department of Health indicate that from August 2002 to November 2002, claimant was treated on several occasions for colds, fever, congestion, cough, ear problems, nasal rhinorrhea, wheezing, immunizations and a bee sting.  (R. 138-145).  Progress notes from Access Community Health Network indicate that from November 5, 2002, through May 29, 2003, claimant was treated on eight occasions for fever, vomiting, diarrhea, runny nose, upper respiratory infection, ear pain and bilateral otitis media.  (R. 161-168).  The records indicate a history of asthma, allergic rhinitis and sleep apnea.  (*Id.*).

On November 5, 2002, claimant was treated in the Emergency Room at the University of Chicago Children's Hospital for acute sinusitis, viral infection and otitis media.  (R. 147-150).  On December 12, 2002, claimant was admitted to the University of Chicago Hospital after he failed to respond to medication therapy for chronic otitis media.  (R. 151-154).  That day, claimant successfully underwent bilateral myringotomy with tube placement performed by Dr. Shilpa Cherukupally.  (R. 123-124, 151-154).

On January 15, 2003, claimant saw Dr. Cherukupally for his first postoperative visit.  (R. 215-216).  Dr. Cherukupally indicated that claimant had no problems with significant otorrhea since his surgery.  (R. 216).  Dr. Cherukupally also indicated that claimant apparently had a problem with snoring associated with some gasping and apneic pauses, which had not been previously evaluated.  (*Id.*).  An ear exam showed

6

claimant's tubes to be in place and patent with no evidence of infection. (*Id.*). Dr. Cherukupally stated that claimant had a history of chronic otitis media and a two week history of yellow rhinorrhea associated with snoring and apneic spells. (*Id.*). Dr. Cherukupally prescribed amoxicillin and scheduled a sleep study. (*Id.*).

On January 24, 2003, claimant was treated by Dr. Handle Alp at La Rabida Children's Hospital for a cold and runny nose. (R. 156). The records indicate claimant was on an infrequent Albuterol regimen since his last visit in December 2002. (*Id.*). Dr. Alp noted that a sleep apnea study was scheduled for March 17, 2003. (*Id.*).

Claimant saw Dr. Cherukupally again on April 2, 2003. (R. 225). Dr. Cherukupally indicated that claimant was doing well with no evidence of otorrhea or significant ear pain. (*Id.*). Dr. Cherukupally further indicated that a sleep study conducted on March 17, 2003 showed that claimant suffered from mild to moderate obstructive sleep apnea. (*Id.*). Dr. Cherukupally found no evidence of apneic spells. (*Id.*). Claimant was continuing to have problems with snoring and chronic mouth breathing, as well as frequent flares of asthma. (*Id.*). Dr. Cherukupally was reluctant to pursue surgery for claimant's obstructive sleep apnea given claimant's age. (Id.). Instead, he opted to start claimant on a course of Flonase. (*Id.*). Dr. Cherukupally also recommended that claimant follow up with the pediatric sleep disorders clinic because claimant's mother was interested in pursuing a CPAP trial prior to surgical intervention. (*Id.*).

On April 4, 2003, claimant was seen in the Emergency Room at La Rabida Children's Hospital. (R. 157). He presented with cough, rhinorrhea and difficulty breathing. (*Id.*). Claimant had run out of his asthma medication. (*Id.*). The records

indicate that claimant had been diagnosed with sleep apnea and that his symptoms were worse when sleeping. (*Id.*).

Claimant saw Dr. Alp on April 25, 2003. (R. 158-159). Dr. Alp again noted an infrequent Albuterol regiment but stated that claimant still had noisy breathing. (*Id.*). The records indicate asthma and adenoid hypertrophy. (*Id.*). Claimant's mother reported that he had been diagnosed with sleep apnea and that surgery was recommended. (*Id.*). Dr. Alp agreed with the ENT's recommendation for surgery (an adenoidectomy). (*Id.*).

On May 14, 2003, claimant saw Dr. Cherukupally for a follow up visit. (R. 228). He reported that claimant never started taking Flonase because claimant's allergist did not feel he would benefit from it. (*Id.*). Dr. Cherukupally indicated that claimant continued to have symptoms of obstructive sleep apnea. (*Id.*). Claimant's mother strongly favored avoiding surgery. (*Id.*). Dr. Cherukupally wrote another prescription for Flonase and scheduled an appointment to see claimant in six weeks. (*Id.*). Dr. Cherukupally indicated that if there was no improvement at the subsequent appointment, he would consider a tonsillectomy and adenoidectomy. (*Id.*).

On October 26, 2003, claimant went to the emergency room at Holy Family Medical Center for ear pain, fever, and cough. (R. 199-203). The records indicate that claimant had a past history of asthma. (R. 200). He was not taking any medication at the time. (R. 199). Claimant was alert, and his conduct was age appropriate. (R. 200-201).

On March 7, 2004, Dr. Dana saw claimant for an ear ache. (R. 284-288). Dr. Dana diagnosed acute viral syndrome and noted a history of asthma. (R. 284, 286).

Dr. Dana indicated that claimant's condition was stable. (R. 286). On May 24, 2004, Dr. Dana saw claimant for fever, runny nose, cough, congestion and ear pain. (R. 276-281). Dr. Dana indicated that claimant's condition was stable. (R. 277).

The oral hearing before ALJ Burton took place on November 2, 2004. (R. 317). Later that day, Dr. Dana examined claimant. (R. 247). Claimant received a nebulizer treatment and Dr. Dana prescribed new medication to try to get claimant's asthma under better control. (*Id.*). He also prescribed medication for claimant's ear pain. (*Id.*). Dr. Dana indicated that the Albuterol and/or Xopenex could cause hyperactivity. (R. 248).

On November 18, 2004, claimant's attorney submitted to the ALJ a Child's Developmental Checklist completed by his teacher at KinderCare. The checklist details claimant's developmental progress in four areas including, social/emotional, physical, cognitive, and language. (R. 252-256). The checklist indicates that claimant regularly performs four out of the five areas of gross motor function listed. (R. 252). The record also indicates that claimant sometimes performs the three fine motor functions listed. (*Id.*). However, the checklist does not address issues such as stamina or frequency of absences. (R. 252-256).

On February 7, 2005, claimant had a polysomnogram to examine his suspected obstructive sleep apnea. (R. 300). The study characterized claimant's sleep apnea as moderate to severe. (*Id.*). On March 25, 2006, claimant successfully underwent a tonsillectomy and adenoidectomy to correct his obstructive sleep apnea. (R. 306-308). The surgery was performed by Dr. Fuad Baroody. (*Id.*). After the surgery, claimant was prescribed amoxicillin and Tylenol with codeine. (*Id.*). He was scheduled to follow up

9

with his ENT two weeks after the surgery.  (*Id.*).

**Medical Expert's Testimony**

Dr. Milford Schwartz testified as the medical expert ("ME") at the hearing.  (R. 332).  The ME testified that claimant had two severe impairments: severe asthma and severe obstructive sleep apnea.  (*Id.*).  The ME also noted a history of recurrent otitis, but stated that it was limited to acute episodes.  (*Id.*).  The ME testified that there was really no evidence in the file to support chronic ear disease.  (*Id.*).  The ME stated that ear infections were common for children claimant's age, and there was nothing to distinguish claimant's problem from that of the average child. (R. 333.).  The ME noted that he did not have any records for claimant for 2003.  (R. 327, 333).  The ME testified he was unable to determine whether claimant's ear tubes were still in place because he had no current information.  (R. 333).

The ME stated that in his opinion, there was insufficient evidence to determine the severity of either of claimant's impairments.  (R. 333-334).  The ME stated that a detailed school activities questionnaire from claimant's school and information regarding claimant's absences from school would help him determine the severity of claimant's impairments.  (R. 335).  The questionnaire would provide objective evidence of claimant's motor abilities while the information about absences would go to domain six, health and physical well-being.  (R. 334-335).  The ME stated that claimant is clearly limited in the health and physical well-being domain.  (R. 335).  The ME testified that, with regard to domain six, claimant was clearly having increasing problems, such as more asthma attacks.  (*Id.*).

The ME testified that he could not address the frequency or severity of claimant's

established impairments or the side effects of his medications because he was missing medical records for half of claimant's life. (R. 336). The ME stated that for a three year-old, a year and a half is a substantive amount of time. (Id.). The ME also said that he could not determine the actual cause of claimant's hyperactivity without current medical evidence. (R. 336-337).

The ME testified that the record could be adequately supplemented by the school activities questionnaire and Dr. Dana's records from the year prior to the hearing. (R. 337). The ME also requested an updated progress report from Dr. Dana stating the plan for claimant's treatment for the next twelve months. (R. 338). The ALJ indicated that he would leave the record open for purposes of obtaining the school questionnaire, the updated medical records and "the doctor's further opinion with respect to the impairments." (Id.).

**LEGAL ANALYSIS**

**I.     Standard of Review**

We must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the

Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.* While the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," he need not discuss every piece of the evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler,* F.2d 284, 287 (7th Cir. 1985)).

## II.    Analysis Under the Social Security Act

Whether a claimant qualifies to receive child's Supplemental Security Income benefits depends on whether the child is "disabled" under the Social Security Act. A child under the age of eighteen is disabled if he or she has a medically determinable physical or mental impairment (or combination of impairments) that results in "marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a child is disabled, the ALJ must consider the following three-step inquiry: "(1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment or combination of impairments that is severe, and (3) whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals one of the listed impairments." 20 C.F.R. § 416.924. If the child is not engaged in substantial gainful activity, and has a severe impairment, but the impairment does not meet or equal a listed impairment, the ALJ must assess the child's

12

functional abilities, together with other relevant evidence, to determine whether the child is disabled.  20 C.F.R. § 416.924a.

In determining functional equivalence, the ALJ must examine the evidence of record and determine a child's level of functioning in "six domains."  20 C.F.R. § 416.926a(b)(1).  The six domains include: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being.  *Id.*  In order for a claimant's impairment or combination of impairments to "functionally equal" a listed impairment, the impairment or impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(d).

A "marked" limitation exists when the impairment(s) interferes seriously with the claimant's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2).  A "marked" limitation means a limitation that is "more than moderate" but "less than extreme."  *Id.*  An "extreme" limitation exists when the impairment(s) interferes very seriously with the child's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3).  An "extreme" limitation also means a limitation that is "more than marked."  *Id.*

The ALJ followed this three-step analysis.  At step one, the ALJ found that claimant had not engaged in substantial gainful activity since the alleged onset of the disability.  (R. 16, 21).  At step two, the ALJ found that claimant's reactive airway disease (asthma), obstructive sleep apnea and history of chronic otitis media were severe impairments.  *Id.*  At step three, the ALJ determined that the evidence failed to

establish that claimant's impairment(s) met or medically equaled a listed impairment. (R. 18, 21). Next, the ALJ found that the claimant did not have an "extreme" limitation in any domain of functioning, or a "marked" limitation in two domains of functioning. (R. 19-21). Therefore, the ALJ found that claimant's impairments did not functionally equal one of the listed impairments. (R. 21).

Claimant contends that the ALJ erred in failing to address important evidence such as the ME's testimony and medical records submitted post-hearing. Claimant also argues that the ALJ erred in failing to fully develop the record. Claimant further contends that the ALJ's credibility determinations are improper. Finally, claimant argues that remand is warranted to consider new and material evidence.

## III. The ALJ's Decision Is Not Supported By Substantial Evidence Or Free From Legal Error

### A. The ALJ Failed To Address Important Aspects Of The ME's Testimony And Medical Records Submitted Post-Hearing

Claimant argues that the ALJ failed to discuss the ME's testimony that he could not determine the severity of claimant's impairments because the record was insufficient. An ALJ is not required to address every piece of testimony and evidence. *Dixon,* 270 F.3d at 1176. However, "an ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow [us] to trace the path of his reasoning." *Diaz,* 55 F.3d at 307.

Here, the ALJ failed to address the ME's testimony that additional evidence was necessary in order to determine the severity of claimant's impairments. (R. 15-22).

Indeed, the ALJ failed to discuss most of the ME's testimony. (*Id.*). The ALJ devoted only one sentence of his entire opinion to the ME's testimony. (R. 20). As claimant suggests, the ALJ would not have called the ME in the first place unless he thought he needed a medical expert's opinion. *See e.g.*, 20 C.F.R. 416.927(f)(2)(iii) (stating that administrative law judges may ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments). This is not a case where the ALJ decided that an ME was unnecessary. Rather, the ALJ determined that he needed an ME's opinion but the ME was unable to offer an opinion regarding the severity of claimant's impairments because the record lacked sufficient evidence at the time of the hearing.

Furthermore, at the hearing, the ALJ stated that he would leave the record open until he obtained the additional evidence and a supplemental opinion from the ME. (R. 338). However, the ALJ never submitted the additional evidence to the ME nor did he obtain a supplemental opinion from the ME. The ALJ failed to explain himself in this regard. (R. 15-22). Therefore, it is unclear what changed the ALJ's mind - that is, why he suddenly felt he was able to assess the severity of claimant's impairments without a supplemental opinion from the ME. (R. 15-22). As a result, this Court cannot trace the path of the ALJ's reasoning.

Claimant also argues that the ALJ misstated the date of claimant's last treatment, and failed to discuss records from claimant's doctor dated the same day as the hearing. The ALJ's opinion states that claimant was last treated on March 7, 2004. (R. 18). However, medical records that were submitted post-hearing show that claimant was treated by Dr. Dana on November 2, 2005, the day of the hearing. (R. 247). The

records show that Dr. Dana prescribed new medication because the prior medication had failed to control claimant's asthma. (R. 247). The ALJ failed to discuss these records, despite the fact that they indicate claimant was still having problems with his asthma. (R. 15-22). The ALJ did not indicate what weight, if any, he gave to the post-hearing evidence in reaching his conclusion that claimant was not disabled.

Because the ALJ failed to sufficiently articulate his assessment of the evidence, we cannot be certain that he considered all of the important evidence. Moreover, we are unable to trace the path of his reasoning. Therefore, remand is warranted. *Carlson,* 999 F.2d at 181.

### B.     The ALJ Failed to Fully Develop The Record

Claimant also argues that the ALJ erred because he failed to fully develop the record. While a claimant has the burden to prove his disability, the ALJ has a duty to develop a full and fair record. *Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000) (citing *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991)). Failure to fulfill this obligation is "good cause" to remand for gathering of additional evidence. *Id.*

Here, the ME testified that he needed additional evidence in order to determine the severity of claimant's impairments. (R. 333-334). In particular, the ME testified that he needed a detailed school activities questionnaire from claimant's school. (R. 337). The school activities questionnaire was necessary to provide an objective comparison of claimant's abilities vis-a-vis his peers. (R. 334). The ME also indicated that he needed information from the claimant's school regarding his absences to assess domain six, claimant's health and physical well-being. (R. 335). The ME further testified that he needed medical records from claimant's doctor for the year prior to the

hearing and an updated progress report from claimant's doctor in order to project claimant's situation over the following twelve months. (R. 337-338).

The ALJ stated that he would keep the record open until the additional evidence was obtained and he was able to get a further opinion from the ME regarding the severity of claimant's impairments. (R. 338). The school activities questionnaire and updated treatment records were submitted post-hearing. (R. 247-251, 252-256). However, the ALJ never obtained information from the claimant's school regarding his absences. Moreover, the ALJ failed to submit the school questionnaire or the updated treatment records to the ME and he failed to obtain a supplemental opinion from the ME.

As discussed above, the ALJ would not have called the ME if he did not think he needed a medical expert's opinion. However, after the ALJ obtained some of the additional evidence that the ME had requested, the ALJ proceeded to assess the severity of claimant's impairments without the benefit of a supplemental opinion from the ME. In this Court's opinion, the ALJ did not fulfill his obligation develop a full and fair record because he failed to obtain school records regarding claimant's absences and because he failed to obtain a further opinion from the ME. Accordingly, this Court finds that remand is warranted. *Smith*, 231 F.3d at 437.

### C.     The ALJ's Credibility Determinations Fail To Comply With SSR 96-7p

Claimant also contends that the ALJ erred in his credibility determinations. This Court agrees. An ALJ must comply with the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, an ALJ must

17

articulate the reasons behind credibility evaluations:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that the "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Here, the ALJ did not articulate the reasons for either of his credibility findings. With respect to claimant's mother's testimony, the ALJ outlined her testimony. (R. 20). Later in the opinion, the ALJ stated, "I find claimant's mother less than fully credible." (R. 21). However, the ALJ never set forth any specific reasons for this credibility finding. (R. 15-22). With respect to the claimant, the ALJ simply stated that claimant's subjective complaints are considered credible only to the extent that they are supported by the evidence of record. (R. 21). Again, the ALJ never set forth any specific reasons for this credibility finding. (R. 15-22). Because the ALJ failed to comply with the requirements of SSR 96-7p, the ALJ's credibility determinations cannot stand. *See Brindisi,* 315 F.3d at 788. On remand, the ALJ must set forth specific reasons for his credibility findings in accordance with SSR 96-7p.

## IV. Claimant's Motion For Remand

Next, claimant argues that new evidence warrants remand pursuant to sentence six of 42 U.S.C. § 405(g). Specifically, claimant contends that this case should be remanded for consideration of medical records showing that claimant had surgery to correct his sleep apnea on March 25, 2005, within two weeks of the ALJ's decision.

Sentence six of § 405(g) permits the court to remand a case for further consideration "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Sample v. Shalala*, 999 F. 2d 1138, 1144 (7th Cir. 1993). To prevail on this issue, claimant must establish that the evidence satisfies the requirements of newness, materiality, and good cause. *Id.*

The evidence in question is new and claimant had good cause for not presenting the evidence prior to the ALJ's decision because it did not yet exist. However, claimant also bears the burden of establishing that the evidence is material. Materiality requires a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered. *Id.* At the time the ALJ issued his decision, he knew that claimant's doctor was considering surgery to correct claimant's sleep apnea. Moreover, the new records do not reveal any additional functional limitations. Therefore, this Court finds that claimant has failed to establish a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered. Accordingly, claimant's motion for remand pursuant to sentence six of 42 U.S.C. § 405(g) is denied.

Claimant also argues that pursuant to 20 C.F.R. § 416.1470(b), the Appeals Council should have considered additional evidence that was submitted post-hearing, including a February 7, 2005 polysomnogram showing moderate to severe sleep apnea and the records of claimant's March 25, 2005 surgery. Claimant contends that the Appeals Council erred in failing to remand based on this additional evidence. Claimant's arguments in this regard are not persuasive. In denying claimant's request

for review, the Appeals Council stated that it considered the memorandum from claimant's representative and the additional evidence but concluded that neither provided a basis for changing the ALJ's decision. (R. 7-8). Accordingly, the Appeals Council denied claimant's request for review. (R. 7). Once the Appeals Council denied claimant's request for review, the ALJ's decision, not the Appeals Council's denial, became the final decision of the Commissioner. *Damato v. Sullivan*, 945 F.2d 982, 988 (7th Cir. 1991). Thus, the ALJ's decision is the final decision that the court reviews. *Id.*

Claimant suggests that the Appeals Council's decision is subject to judicial review. To a certain extent, claimant is correct. However, judicial review of an Appeals Council's denial of a claimant's request for review is limited because that decision is discretionary. *Eads v. Secretary of Health & Human Servs.,* 983 F.2d 815, 817 (7th Cir. 1993). Nevertheless, if the Appeals Council's denial "rests on a mistake of law," such as a determination that newly submitted evidence was not material to the disability determination, the court can reverse. *Id.* Here, claimant has failed to demonstrate that the Appeals Council's decision was based on a mistake of law. As in *Eads*, the denial in this case "was not based on any contestable legal determinations." *Id.* Accordingly, we will not remand on this basis.

**CONCLUSION**

For the reasons set forth above, claimant's motion for summary judgment is granted. Claimant's motion for remand pursuant to sentence six of 42 U.S.C. § 405(g) is denied. The Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United Stated Magistrate Judge**

**Dated: June 1, 2007**